## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAGUIRE INSURANCE AGENCY, INC.<br>D/B/A PHILADELPHIA INSURANCE<br>COMPANIES, | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : <br> : |
| AMYNTA AGENCY, INC., PDP GROUP,<br>INC. D/B/A AMYNTA SURETY<br>SOLUTIONS, STEPHAN MAY, and<br>CHRISTOPHER SPICHER, collectively, | : <br> : <br> : <br> : <br> : |
| Defendants. | : |

Civil Action No. _____

## <u>VERIFIED COMPLAINT</u>

Maguire Insurance Agency, Inc. d/b/a Philadelphia Insurance Companies ("Plaintiff" or "Philadelphia Insurance") brings this Verified Complaint for injunctive and other relief against Defendants, Stephan May ("May"), Christopher Spicher ("Spicher") (together, the "Individual Defendants") and their new employer, Amynta Insurance Agency. Inc. and PDP Group, Inc. d/b/a Amynta Surety Solutions (collectively, "Amynta") (together with the Individual Defendants, collectively, the "Defendants"), and respectfully avers as follows:

### A.    <u>NATURE OF ACTION</u>

1.    This action is based on, among other acts of misconduct, the Individual Defendants' breaches of their respective Confidentiality and Noncompetition Agreements with Philadelphia Insurance and Amynta's tortious interference with those agreements; the Individual Defendants' breaches of their fiduciary duties and duties of loyalty owed to Philadelphia Insurance and Amynta's aiding and abetting those breaches; and Amynta's unfair competition with Philadelphia Insurance.

2.     Specifically, the Confidentiality and Noncompetition Agreements, in relevant part, prohibit May and Spicher, during their employment with Philadelphia Insurance and for a period of one (1) year thereafter, from directly or indirectly soliciting aiding, or inducing any employee of Philadelphia Insurance to leave such employment or to accept employment with another corporation; soliciting, recruiting, or hiring any such employee; or assisting any other person or entity to do so.  (*See* May's and Spicher Confidentiality and Noncompetition Agreements, Exhibits 1 and 2, respectively (hereinafter, the "May and Spicher Agreements"), at ¶ 3).

3.     The May and Spicher Agreements, in relevant part, also contain certain restrictions, during employment and for the twelve (12) month period thereafter, with respect to soliciting agents, brokers, insureds, policyholders, customers, accounts, and leads of Philadelphia Insurance.  (*Id.* at ¶ 2).

4.     On October 8, 2021 and October 11, 2021, respectively, May and Spicher announced their intention to resign from Philadelphia Insurance effective October 22, 2021.

5.     On October 22, 2021, May and Spicher were terminated from Philadelphia Insurance for Cause for reasons including their role in the departure of a total of eight (8) Philadelphia Insurance employees in less than two (2) business days (including May and Spicher) to join Amynta.  They facilitated the departure of these employees by, among other things,  engaging in a coordinated and concerted effort to drive a wedge between all of the employees reporting to them and the Company's "home office" through repeated criticisms of the Company's business practices, to make them 'ripe for the picking.'  After sowing doubt and discontent among the employees reporting to them, on information and belief, May and Spicher

further assisted Amynta in soliciting and inducing these employees to resign from Philadelphia Insurance at the same time and/or to join their new team at Amynta.

6.     Amynta, upon information and belief, is and has been aware of the Individual Defendants' respective Agreements with Philadelphia Insurance, and their obligations—during- and post-employment—associated therewith.

7.     Further, Amynta, upon information and belief, is and has been aware of the aforementioned breaches of the Individual Defendants described herein, and, upon information and belief, has unfairly and intentionally encouraged and facilitated the infiltration and pilfering of Philadelphia Insurance's entire team reporting to May, to gain an unfair competitive industry advantage in their efforts to expand into commercial surety in the areas the May team covered.

8.     These acts constitute multiple direct violations of the May and Spicher Agreements with and obligations to Philadelphia Insurance, and have resulted and will result in disruption to Philadelphia Insurance's office and business stability, material losses to Philadelphia Insurance's employee, client, and agent goodwill and competitive position and standing within the commercial surety industry. If not ultimately enjoined, these unlawful acts will continue to severely injure Philadelphia Insurance's commercial surety business, particularly in the current COVID-19 pandemic environment that continues to present its own set of challenges to Philadelphia Insurance and its industry counter-parts.

9.     This action seeks, among other relief, to halt Defendants' collective scheme and concerted effort, spear-headed by May and Spicher, to violate the May and Spicher Agreements and obligations and to raid Philadelphia Insurance, virtually overnight, of employee, client, and agent goodwill and business opportunities, built up by Philadelphia Insurance over many years, to benefit Amynta and unfairly and directly compete with Philadelphia Insurance.

B.    **THE PARTIES**

10.    Maguire Insurance Agency, Inc. d/b/a Philadelphia Insurance Companies, is a Pennsylvania corporation with its principal place of business at One Bala Plaza Suite 100, Bala Cynwyd, Pennsylvania 19004.

11.    Philadelphia Insurance is the former employer of the Individual Defendants.

12.    Defendant Amynta Agency, Inc. is a Delaware corporation with its principal place of business located at 909 3rd Avenue, Floor 33, New York, New York, 10022.

13.    Defendant PDP Group, Inc. d/b/a Amynta Surety Solutions is a Maryland corporation with its principal place of business at 855 Winding Brook Drive, Glastonbury, CT 06033.

14.    Upon information and belief, Amynta has offices in the Philadelphia area, Connecticut, Chicago, Dallas, Houston, New Orleans, and New York.

15.    Amynta, now a direct competitor of Philadelphia Insurance in the areas May and his commercial surety team previously covered, is the new employer of the Individual Defendants.

16.    Defendant Stephen May is the former Vice President, Commercial Surety, of Philadelphia Insurance, responsible for the North West, Rocky Mountain, North Central, Central, and Ohio Valley West areas.

17.    Defendant May is last known to reside at 353 E. Wiser Lake Road, Lynden, Washington 98264.

18.    Defendant Christopher Spicher is the former Surety Underwriting Manager, responsible for the North West and Rocky Mountain areas, of Philadelphia Insurance.

4

19.     Defendant Spicher is last known to reside at 5517 159th Ave SE, Snohomish, Washington 98290.

C.     **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Philadelphia Insurance, on the one hand, and Defendants, on the other hand, are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

21.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b), as it is the district in which, *inter alia*, the Defendants are subject to personal jurisdiction and/or the conduct complained of was directed and therefore arose, the injury complained of is being inflicted, and a substantial part of the property that is the subject of the action is situated.

22.     Venue is also proper in this judicial district pursuant to the enforceable venue clauses in the May and Spicher Agreements.  (*See* Exhibits 1 and 2, at ¶ 10**).**

D.     **THE FACTS**

23.     Philadelphia Insurance is engaged in the business of designing, marketing, and underwriting commercial property insurance products and surety bonds.

24.     Philadelphia Insurance's surety product line is organized into two (2) Divisions: (1) Contract Surety; and (2) Commercial Surety.

25.     The Commercial Surety Division, led by James Crinnion ("Crinnion"), Vice President, Commercial Surety, sits within the larger surety product line.

26.     The Commercial Surety Division designs, markets, and underwrites commercial surety bonds for a wide range of businesses and industries.

27.     The Commercial Surety Division is divided into six commercial surety teams that are each responsible for different territories within the United States.

28.     May began his employment with Philadelphia Insurance on April 6, 2015 as Vice President, Commercial Surety, reporting directly to Crinnion.

29.     While employed at Philadelphia Insurance, May led one of the six commercial surety teams within the Commercial Surety Division.

30.     May's team was responsible for commercial surety needs in the following territories:  North West, Rocky Mountain, North Central, Central, and Ohio Valley West.

31.     Spicher also began his employment with Philadelphia Insurance on April 6, 2015, as a Senior Specialty Underwriter, reporting into May.

32.     Spicher was later promoted to Surety Underwriting Manager.

33.     At the time of his departure, May's Commercial Surety team was comprised of five individuals:

(a)     Spicher (Surety Underwriting Manager);

(b)     Mary Norrell ("Norrell") (Surety Underwriter II);

(c)     Dirk Bakker ("Bakker") (Surety Underwriter);

(d)     Corey Carmichael ("Carmichael") (Senior Surety Underwriting Specialist); and

(e)     Larry Pottle ("Pottle") (Surety Underwriter).

34.     In addition, the following employees also reported to May until earlier this year:

(a)     Julie Gist ("Gist") (Underwriting Supervisor I); and

(b)     Meghan (Meg) Lamoureux ("Lamoureux") (Underwriting Assistant).

35.     May, Spicher, Norrell, Bakker, Carmichael, Pottle, Gist, and Lamoureux are collectively referred to as the "Departing Employees".

6

36.     May, Spicher, and Gist had worked together for the better part of twenty (20) years.

37.     Below is the Organizational Chart as of the time of the mass departure of the Departing Employees to Amynta:



38.     As noted above, May was the Vice President, Commercial Surety, responsible for North West, Rocky Mountain, North Central, Central, and Ohio Valley West.

39.     Spicher, as the Surety Underwriting Manager, was responsible for the North West and Rocky Mountain regions.  Spicher reported directly to May.

40.     Spicher directly supervised Norrell and Bakker.

41.     Carmichael started off as the Senior Surety Underwriting Specialist for May's commercial surety team.  He was promoted to Assistant Regional Manager earlier this year, and was responsible for the North Central, Central, and Ohio Valley West Regions.  Carmichael reported directly to May.

42.     Carmichael  directly supervised Pottle.

43.     As noted above, Gist and Lamoureux also reported to May until earlier this year.

44.     By virtue of his senior position, May worked directly and cultivated relationships with hundreds of agents, brokers and accounts on behalf of Philadelphia Insurance, and participated in the underwriting of dozens of key accounts across six (6) regions.

45.     May's commercial surety team was responsible for approximately 35% of Philadelphia Insurance's total annual commercial surety business revenue for 2020, and was responsible for Philadelphia Insurance's entire Northwest, Mountain, Central, North Central, and the Ohio Valley West commercial surety business.

46.     As detailed further below, the Departing Employees announced their resignations from Philadelphia Insurance, over two business days, between October 8 (May, Carmichael, Norrell, Bakker, Gist, and Lamoureux) and October 11 (Pottle and Spicher), 2021, to join Amynta.

47.     Amynta, now a direct competitor of Philadelphia Insurance, is an insurance services provider of casualty and warranty protection products and services.

48.     In or around July 2020, Amynta, seeking to expand its commercial surety services, acquired the surety operations of Aspen Insurance.

49.     But, even after this acquisition, Amynta was not a significant competitor in the areas and specialties covered by May's Philadelphia Insurance commercial surety team.

  **(b) MAY AND SPICHER'S EMPLOYMENT AND CONTRACTUAL OBLIGATIONS TO PHILADELPHIA INSURANCE**

50.     At the time of their hires, and in consideration for their employment with Philadelphia Insurance in 2015, May and Spicher were asked to sign, and did sign, individual

Confidentiality and Noncompetition Agreements as a condition of their employment. (*See* Exhibits 1 and 2).

51.     Among those covenants, during their employment with Philadelphia Insurance and for a period of one (1) year thereafter, May and Spicher agreed to refrain from directly or indirectly soliciting or inducing employees or representatives of Philadelphia Insurance to leave their employment with the company or assisting any other person or entity to recruit or hire such personnel.

52.     Specifically, each of May and Spicher agreed:

> During the Employee's term with the Company and for a period of [1] year thereafter, the Employee agrees that they shall not, except in the furtherance of the Employee's duties hereunder, **directly or indirectly, individually or on behalf of any other** person, firm, corporation or other entity, **solicit, aid or induce any employee, or representative of the Company** or any of its subsidiaries or affiliates **to leave such employment** or retention **or to accept employment with or render services to or with any other** person, firm, corporation or other entity unaffiliated with the Company **or hire or retain any such employee**, representative or agent, **or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee**, or representative.

(*Id.* at ¶ 3) (emphasis added).

53.     May and Spicher also agreed to certain restrictions with respect to the agents, brokers, and customers of Philadelphia Insurance.  (*See id.* at ¶ 2).

54.     Specifically, May and Spicher each promised:

> Employee covenants and agrees that for a period of **twelve (12) months following termination of their employment** with Company, **Employee will not solicit** by mail, email, phone, personal meeting, or other means, any current or prospective **agent, broker, insured, policyholder, customer, account, or any lead derived therefrom whom Employee serviced or whose name became known to Employee either directly or indirectly during the two (2) years** preceding termination of Employee's employment with the Company (hereinafter "Company Business Contact"), for purposes of inviting or encouraging such Company Business Contact to transfer its business, business relationship, or

9

patronage from Company to Employee, to Employee's new employer, or to any other third party.  Employee represents to Company that the knowledge, skill and abilities they possesses on the date of this Agreement are sufficient to permit Employee to earn a living by working within the restrictions set forth herein. **Notwithstanding the foregoing and <u>provided Employee is not terminated for Cause,</u> Employee shall be permitted** to take the following action subsequent to termination of their employment with Company: (a) Employee may continue their relationship with the agencies identified in Exhibit A; and (b) Employee may directly or indirectly solicit any surety accounts that Employee maintained a relationship with through such agencies prior to becoming employed with Company; **provided, however, Employee shall be prohibited from pursuing, soliciting, or procuring bonds for any surety account with which they did not have a relationship prior to their term of employment with Company and for which Company issues bonds, instruments of guarantee or other surety obligations during Employee's term with Company.**

(*Id.* at ¶ 2) (emphasis added).

55.     In addition, May and Spicher agreed to keep all of Philadelphia Insurance's confidential and proprietary information confidential even after the termination of their employment.  May and Spicher each agreed that:

Employee acknowledges that all **Confidential Information constitutes the exclusive property of the Company**, including any Confidential Information created or developed by Employee within Employee's job function during the term of employment. Employee agrees they **shall not disclose Confidential Information** to any third party during the term of their employment or at any time thereafter. In addition, Employee **shall not reproduce or furnish any copies** of Confidential Information (whether in written, oral, or computerized form) to any other person or firm.

(*Id.* at ¶ 1) (emphasis added).

56.     May and Spicher also agreed to return all Confidential Information to the Company:

57.     May and Spicher also agreed to return any and all Confidential Information:

Upon termination of employment, Employee **shall not remove** any Confidential Information from Company and **shall immediately return** any Confidential Information in their possession.

(*Id.* at ¶ 1) (emphasis added).

58.     May and Spicher also agreed that their restrictions would be extended for the period of any violation thereof:

> Any period of violation of this Agreement which results in legal action to enforce same shall toll the period of time in which employee shall be restricted hereunder, so that such restricted period shall begin and be in full force and effect from the date of such enforcement.

(*Id.* at ¶ 13).

59.     May and Spicher also acknowledged and agreed that Philadelphia Insurance is entitled to injunctive relief to address the breach or threatened breach of their Agreements:

> …the restrictions contained in this Agreement are **reasonable and necessary to protect the legitimate business interests of Company** and that any violation of this Agreement will result in **immediate and irreparable harm to Company** for which a remedy at law will be inadequate. Employee further acknowledges and agrees that **upon any such breach or threatened breach, Company shall be entitled to injunctive relief and specific performance of Employee's obligations** hereunder without having to prove inadequacy of any remedy at law or actual damages to the Company.

(*Id.* at ¶ 6) (emphasis added).

60.     May and Spicher further agreed to pay Philadelphia's attorneys' fees and costs associated with enforcement of their Agreements:

> **Employee shall pay all costs and expenses**, including reasonable attorney's fees, incurred by Company to enforce the terms of this Agreement.

(*Id.* at ¶ 6) (emphasis added).

61.     In addition to the above agreements, Philadelphia Insurance required employees, including Spicher, May, and the others who departed to Amynta, to comply with Philadelphia Insurance's Employee Handbook. (*See* <u>Exhibit 3</u>, Employee Handbook excerpts). The Employee Handbook includes a Confidentiality Policy and Code of Conduct, which warns employees against misusing confidential information belonging to Philadelphia Insurance and conflicts of

interest, which exist "when a person's private interest interferes in any way, or even appears to interfere, with the interests of the Company."  (*See* <u>Exhibit 3</u> at p. 19, p. 23).

62.     May and Spicher acknowledged receipt and accepted the terms of the Employee Handbook upon the commencement of their employment with Philadelphia Insurance.  (*See* <u>Exhibit 4</u> and <u>Exhibit 5</u>, May and Spicher Acknowledgement of Receipt of Employees Handbook, respectively).

**(c)     THE INDIVIDUAL DEFENDANTS *EN MASSE* DEPARTURES FROM PHILADELPHIA INSURANCE TO AMYNTA**

63.     In or around August and September 2021, Defendants May and Spicher, upon information and belief, with the express or tacit approval of Amynta, assisted Amynta in the wholesale solicitation, inducement, recruitment, departure, and hiring of key personnel within Philadelphia Insurance's Commercial Surety Division to leave Philadelphia Insurance and/or to join Amynta.

64.     May's *entire* team (comprising of Spicher, Carmichael, Norrell, Pottle, and Bakker) as well as two other employees within the Commercial Surety Division who had, until recently, reported to May (Gist and Lamoureux), announced, between Friday, October 8 and Monday, October 11, 2021, their intention to resign from Philadelphia Insurance, effective October 22, to join Amynta.

> (a)     On the morning of October 8, 2021, May announced his intention to resign effective October 22, 2021.
>
> (b)     Shortly thereafter on the morning of October 8, 2021, Norrell announced her intention to resign effective October 22, 2021.
>
> (c)     Shortly thereafter, on October 8, 2021, Gist announced her intention to resign effective October 22, 2021.

(d)     Shortly thereafter in the early afternoon on October 8, 2021, Carmichael announced his intention to resign effective October 22, 2021.

(e)     Shortly thereafter in the afternoon on October 8, 2021, Bakker announced his intention to resign effective October 22, 2021.

(f)     Shortly thereafter in the afternoon on October 8, 2021, Lamoureux announced her intention to resign effective October 22, 2021.

(g)     Pottle was on vacation the prior week.  Late at night on Sunday, October 10/early morning on October 11, 2021, Pottle announced his intention to resign effective October 22, 2021.

(h)     Finally, after having expressed on October 8 that he had no intention of resigning, on October 11, 2021, Spicher announced his intention to resign effective October 22, 2021.

65.     The Departing Employees' impact on Philadelphia Insurance's business is substantial and cannot be understated.

66.     First, the resignation and Amynta's raiding of May's entire commercial surety team eliminated *all* of the persons responsible for directly handling the Commercial Surety Division's business in the Northwest, Rocky Mountain, Central, North Central, and the Ohio Valley West Regions, resulting in overnight significant disruption of Philadelphia Insurance's office and business stability.

67.     Second, as stated above, in 2020, May's commercial surety team generated approximately 35% of Philadelphia Insurance's commercial surety revenue.  A loss this substantial will undoubtedly have a severe impact on Philadelphia Insurance's business, as agents and brokers and the accounts they refer follow May's team to Amynta.

68.     Philadelphia Insurance's investigation surrounding the *en masse* departures from Philadelphia Insurance to Amynta is just beginning.

69.     However, Philadelphia Insurance has already discovered information causing grave concern about Defendants' activities, intentions, and unfair competition.

DM1\12560629.1

<u>Behind the Scenes Discussions</u>

70.     May denies having anything to do with the coordinated departure of his entire team, but acknowledges that he spoke several months ago with Michael Toppi, who upon information and belief is the Chief Executive Officer of Amynta's surety operations.

71.     Beyond the fact that it is virtually impossible that the simultaneous departure of May's entire team could have been accomplished without May's knowledge, assistance, and/or acquiescence, Philadelphia Insurance has uncovered communications that suggest to Philadelphia Insurance that May was involved.

72.     May admits that he began speaking with Amynta a couple of months ago.

73.     On July 22, 2021, Steve May reached out to at least three of the Departing Employees—Bakker, Carmichael, and Pottle—to pass along to them information—which May had referenced in a prior discussion with them—that  that May found to be "interesting" and "eye opening," and exchanged personal email addresses and personal cell phone numbers with them to move the conversation outside of the Philadelphia Insurance system:

DM1\12560629.1

**To:**       stephanjmay@gmail.com[stephanjmay@gmail.com]
**From:**     May, Steve[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF4B1734DBD741A0AE26A632FBD9A5FB-MAY, STEVE]
**Sent:**     Thur 7/22/2021 3:21:38 PM (UTC-04:00)
**Subject:**  FW: Dirk's Personal Email

FYI

**Steve May, AFSB**
O: 206.607.3336  |  M: 206.200.7040  |  Steve.May@phly.com
Hear what our agents are saying about their experience with The PHLY *Difference*
Watch our video series to learn more about PHLY's surety options

**From:** Bakker, Dirk <Dirk.Bakker@phly.com>
**Sent:** Thursday, July 22, 2021 10:03 AM
**To:** May, Steve <Steve.May@phly.com>
**Subject:** Dirk's Personal Email

Steve,

Thank you again for the meaningful and insightful discussion that we just had. I greatly appreciate it and will take our convo to heart.

Here is my personal email – drkmbkkr@gmail.com and cell 425-495-4366.

Thanks,

**Dirk Bakker, AFSB**
Surety Underwriter
Philadelphia Insurance Companies
A Member of the Tokio Marine Group

1420 5th Ave, Suite 3510 | Seattle, WA 98101
O: 206.607.3350  |  M: 425.375.3821 Dirk.Bakker@phly.com
Hear what our agents are saying about their experience with The PHLY *Difference*

**To:**       Carmichael, Corey[Corey.Carmichael@phly.com]
**From:**     Stephan May[stephanjmay@gmail.com]
**Sent:**     Thur 7/22/2021 3:26:14 PM (UTC-04:00)
**Subject:**  Interesting Information

CAUTION: Be mindful prior to opening non-TMNA attachments and/or links.

Good afternoon, Corey.  As promised, I wanted to pass along my personal email address in case you have interest in some of the items I have referenced. Again, there is no pressure here nor manager/other coercion/requirement.  If you're interested in seeing some information that I found eye opening, please share your personal email address and I'd be happy to send it your way.

Kind regards,

Steve May

Shannon Hampton Sutherland
Duane Morris LLP
SHSutherland@duanemorris.com
Office:  215.979.1104
Cell:  267.226.2094
Fax:  215.689.4956

15

**To:**      Stephan May[stephanjmay@gmail.com]
**From:**    Pottle, Larry[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1C5CEDF0C08C422FB784D383FDEF79BA-POTTLE,
LAR]
**Sent:**    Thur 7/22/2021 3:29:29 PM (UTC-04:00)
**Subject:** RE: Information

Not at all Steve you've piqued my interest and I am curious to see the information we discussed, please
send it to the following email address at your convenience -

lapottle23@gmail.com

Thanks Steve!

Larry Pottle
Commercial Surety Underwriter
Philadelphia Insurance Companies
A Member of the Tokio Marine Group

200 W Madison Street | Chicago, IL 60606
O: 312.601.8620 | M: 312.285.1608  |  Larry.Pottle@phly.com
Hear what our agents are saying about their experience with The PHLY Difference
Watch our video series to learn more about PHLY's surety options

-----Original Message-----
From: Stephan May <stephanjmay@gmail.com>
Sent: Thursday, July 22, 2021 2:25 PM
To: Pottle, Larry <Larry.Pottle@phly.com>
Subject: Information

CAUTION: Be mindful prior to opening non-TMNA attachments and/or links.

Good afternoon, Larry.  As promised, I wanted to pass along my personal email address in case you have
interest in some of the items I have referenced.  Again, there is no pressure here nor manager/other
coercion/requirement.  If you're interested in seeing some information that I found eye opening, please
share your personal email address and I'd be happy to send it your way.

Kind regards,

Steve May

74.     Upon information and belief, based on the content and context of these messages, and the subsequent near-simultaneous departure of these employees with May, May was reaching out to begin sharing other job opportunities with his team.

<u>Timing and Incentives</u>

75.     During its interview of Gist, Gist reported to Philadelphia Insurance that she was first contacted by Amynta the Wednesday before she resigned.  Gist reported speaking with Michael Toppi, the aforementioned CEO of Amynta's surety operations who upon information and belief hired May, and "Anthony", who Gist described as a "main officer" for Amynta.  Upon information and belief "Anthony" is Anthony Slimowicz, Executive Vice President and Chief Operating Officer of MGA and Specialty Risk at Amynta.  In other words, Gist, who works as an Underwriting Supervisor for Philadelphia Insurance, in an administrative back-office role, was

16

apparently contacted by two high-level executives from Amynta for the first time on Wednesday, October 6, was offered a position over the phone, and then resigned just two days later on October 8.   When she resigned, Gist mentioned several different entities that were involved, including Amynta; it didn't even sound like she knew, or cared, where she was being hired. These facts strongly suggest that Gist's departure was coordinated by others she trusted (such as May and Spicher, with whom she had worked for years) together with the Amynta executives.

76.     Communications of Spicher and May on October 7 also suggest to Philadelphia Insurance that they were acting in concert to coordinate the departures.

77.     In the late afternoon of October 7, Spicher and Norrell had a short Teams call:

| | |
|---|---|
| **Organizer:** | Spicher, Christopher[Chris.Spicher@phly.com] |
| **From:** | <> |
| **Attendees:** | Spicher, Christopher; Norrell, Mary |
| **Importance:** | Normal |
| **Subject:** | Call (None)/Thread Id: /Communication Id: 07a7ee85-7dad-4a81-b792-179b6ca5e676/Spicher, Christopher,Norrell, Mary |
| **Start Time:** | Thur 10/7/2021 5:19:57 PM (UTC-04:00) |
| **End Time:** | Thur 10/7/2021 5:20:26 PM (UTC-04:00) |
| **Required Attendees:** | Spicher, Christopher; Norrell, Mary |

Start Time (UTC): 10/7/2021 9:19:56 PM
End Time (UTC): 10/7/2021 9:20:25 PM
Duration: 00:00:29.2611899

[10/7/2021 9:19:56 PM (UTC)] Chris.Spicher@phly.com joined.
[10/7/2021 9:20:25 PM (UTC)] Chris.Spicher@phly.com left.
[10/7/2021 9:19:56 PM (UTC)] Mary.Norrell@phly.com joined.
[10/7/2021 9:20:25 PM (UTC)] Mary.Norrell@phly.com left.

78.     Minutes after that call ended, Spicher and May had a short call:

| | |
|---|---|
| Organizer: | May, Steve[Steve.May@phly.com] |
| From: | Spicher, Christopher[Chris.Spicher@phly.com] |
| Attendees: | Spicher, Christopher; May, Steve |
| Importance: | Normal |
| Subject: | Call (Complete)/Thread Id: /Communication Id: 3dc3c2b4-16d5-4c74-90ad-5de64dbabafe/Spicher, Christopher,May, Steve |
| Start Time: | Thur 10/7/2021 5:24:32 PM (UTC-04:00) |
| End Time: | Thur 10/7/2021 5:27:37 PM (UTC-04:00) |
| Required Attendees: | Spicher, Christopher; May, Steve |

Start Time (UTC): 10/7/2021 9:24:31 PM
End Time (UTC): 10/7/2021 9:27:37 PM
Duration: 00:03:05.5653688

[10/7/2021 9:24:31 PM (UTC)] Chris.Spicher@phly.com joined.
[10/7/2021 9:27:37 PM (UTC)] Chris.Spicher@phly.com left.
[10/7/2021 9:24:31 PM (UTC)] Steve.May@phly.com joined.
[10/7/2021 9:27:37 PM (UTC)] Steve.May@phly.com left.

79.     Within hours after that call, May scanned his resignation letter to himself in anticipation of his resignation the next morning:

| | |
|---|---|
| To: | May, Steve[Steve.May@phly.com] |
| From: | Stephan May[stephanjmay@gmail.com] |
| Sent: | Thur 10/7/2021 8:33:36 PM (UTC-04:00) |
| Subject: | HP Smart |

Scanned PHLY Resignation.pdf

CAUTION: Be mindful prior to opening non-TMNA attachments and/or links.

80.     The next morning, May was the first to announce his resignation, followed by the seven (7) other Departing Employees' announcements over a two (2) business day period, in a coordinated manner and using a similar script.

81.     For example, in their resignation communications, many of the Departing Employees were "appreciative of the opportunity to work for Philadelphia Insurance" but could not "say no" to Amynta's offer.

82.     Several of the Departing Employees indicated that Amynta made offers they simply could not pass up—suggesting that Amynta was offering above-market or other incentives to induce May's whole team to make their coordinated *en masse* move to interfere

with Philadelphia Insurance's ability to service its clients and agents and help Amynta to compete unfairly virtually overnight.

83.     This is not a mere coincidence, but evidence of Defendants launching an intentional, concerted, unfair attack on Plaintiff's Commercial Surety Division by drawing the entire May team covering five (5) regions, and ultimately business, away from Philadelphia Insurance and to Amynta virtually overnight.

84.     Spicher even attempted to distance himself from the flurry of resignations on October 8, 2021 by waiting until October 11, 2021 to announce his resignation.

85.     On October 8, 2021, Spicher, upon information and belief, intentionally misled Plaintiff by overtly denying any plans to leave Philadelphia Insurance.

86.     That same day, Spicher even joined two (2) management meetings during which plans for transitioning May team's duties and external messaging about the resignations were discussed.  Philadelphia Insurance would have never allowed Spicher to join these confidential meetings if it knew that he would also be announcing his resignation the following Monday or of his plans to join Amynta.

<u>Sowing Discontent</u>

87.     Moreover, May and Spicher, directly or indirectly, induced the Departing Employees to resign from Philadelphia Insurance and join Amynta by launching a campaign to cultivate discord among the May team, in breach of their Confidentiality and Noncompetition Agreements and their duties of loyalty to Philadelphia Insurance.

88.     Increasingly during the last few months of their employment, May and Spicher regularly expressed discontent about Philadelphia Insurance's underwriting process, and

19

specifically the "home office," to employees within the Commercial Surety Division, and on their own team specifically.

89.     For example, May would host recurring internal calls every Tuesday, called the "Western Team Meeting," which included his team as well as employees from other teams within the Commercial Surety Division.  During these calls, in the months leading up to his departure to Amynta, May regularly complained about Philadelphia Insurance and its capabilities.

90.     For example, May and Spicher repeatedly criticized Philadelphia Insurance's underwriting platform.  May and Spicher also repeatedly criticized changes to the Company's underwriting standards and review process that were put in place after the Company experienced a series of losses on commercial surety business underwritten by May and his team.  May and Spicher particularly objected to having the Company's "home office" underwriting team review their submissions, which they viewed as negatively impacting  their team's ability to handle new business – despite the fact that May and Spicher continued to meet the business goals set by "home office" for both new and renewal business.

91.     As a senior executive and member of Philadelphia Insurance's leadership team, May should have been motivating and leading by example and educating personnel about the company's underwriting policies, instead of sowing discontent and doubt in his employees about the Company and creating an unnecessary divide between the "home office" and other underwriting personnel.

92.     May also sowed discontent among his team by criticizing the Company's response to the COVID-19 pandemic; May was critical of the Company's policy prohibiting unvaccinated employees from traveling and meeting with its agents and customers, while at the

20

same time vowing that  he and his team would never return to the Seattle office.  This latter was particularly unfair, divisive and uncalled for, since the team had worked remotely throughout the pandemic and no decision had or has been announced by the Company about whether or not there would be a return to the Seattle office.

93.     In addition, while still an employee at Philadelphia Insurance, and in direct violation of his duty of loyalty, Spicher told at least one agent that Philadelphia Insurance lacked the capabilities to handle his underwriting needs, in an attempt, upon information or belief, to lay the groundwork to transfer the agent's underwriting business away from Philadelphia Insurance.

94.     Spicher (with May's knowledge) also complained to that agent about a Philadelphia Insurance home office employee.

95.     As a manager, Spicher should have addressed any purported concerns with the company's practices or personnel internally, not undermined the company's relationship with agents.

96.     Spicher's phone connected with this same agent's phone on at least October 8 and October 11, suggesting to Philadelphia Insurance that Spicher may have communicated the mass departures to the agent.

<u>The Torpedoing of Philadelphia Insurance's Commercial Surety Business
to Allow Amynta to Unfairly Compete Virtually Overnight</u>

97.     Upon information and belief, May would not have agreed to employment with Amynta without assurance that members of his team would also join him.

98.     May developed his commercial surety team at Philadelphia Insurance, which consisted exclusively of the Departing Employees, and relied on his team to execute his business goals.

DM1\12560629.1

99.     Amynta is a new player in the commercial surety industry, having little or no presence in the regions covered by the May team, and on information and belief, lacks commercial surety experience in the solar sector—an industry that May has focused upon during his employment with Philadelphia Insurance.

100.    In order for May to successfully continue commercial surety business in this space, it is important for him to have an experienced and dedicated team at Amynta.

101.    By "picking off" May's entire team *en masse*, Amynta—virtually overnight— now has a "ready-packaged" commercial surety team without having put in the time, effort, and expense to train that team and build up the goodwill in which Philadelphia Insurance invested over years; and, at the same time that Amynta has taken the entire team, it has interfered with Philadelphia Insurance's stability and ability to service clients and agents.

<u>Lack of Candor and Lack of Cooperation During Exit Interview</u>

102.    As noted above, during calls on October 8 to deal with the fall-out of the announcements of six of the Departing Employees of their intention to resign, Spicher expressed that he was not leaving.  Of course, that turned out to be untrue.

103.    After Pottle's announcement of his resignation late at night on Sunday, October 7/early in the morning on Monday, October 8, Spicher announced his intention to resign, effective October 22.

104.    In his October 11 letter, Spicher indicated , "My last day will be Friday, October 22, two weeks from day."

105.    Upon information and belief, Spicher intended to provide two (2) weeks' notice before his official date of resignation.  Of course, October 22 was *not* two (2) weeks from Spicher's October 11 letter; it was two weeks from October 8—suggesting to Philadelphia

DM1\12560629.1

Insurance that Spicher may have prepared the language for his letter on October 8, but only held it to wait for Pottle to return from vacation and announce his resignation.

106.    Finally, Spicher refused to cooperate with the Company's investigation into the circumstances of his departure and the departure of the May team.

107.    He outright refused to answer questions during his interview which occurred on October 21, 2021 with Regional HR Manager Molly Balzhiser ("Balzhiser").  Spicher refused to disclose information including:  when he was contacted by Amynta, with whom at Amynta he spoke, when he decided to accept Amynta's offer, when he accepted the offer, to whom at Amynta he communicated his acceptance, why he accepted the offer when he did---and cut off the questioning.  He even refused to confirm that he was moving to Amynta, stating to Balzhiser, "this isn't a trial."

### (d)    MAY'S AND SPICHER'S TERMINATION

108.    As a result of their misconduct described above, on October 22, 2021, Philadelphia Insurance sent May and Spicher letters stating that their employment with Philadelphia Insurance was terminated for cause.

### (e)    THE IRREPARABLE HARM DEFENDANTS ARE INFLICTING UPON PHILADELPHIA INSURANCE

109.    In direct violation of one or more of Defendants' obligations, Philadelphia Insurance believes and therefore avers, upon information and belief, that Defendants have coordinated, and will continue to coordinate, an intentional attack on Philadelphia Insurance's Commercial Surety Division, and particularly the five (5) regions May managed, by soliciting all of the employees directly responsible for these regions to start employment with Amynta; competing and/or preparing to compete with Philadelphia Insurance in the same territories with

respect to the same actual and potential agents accounts to which the Individual Defendants' and other members of the May team were assigned while at Philadelphia Insurance; that Defendants are planning on soliciting and diverting Philadelphia Insurance's agents and accounts; and that Defendants have Philadelphia Insurance's goodwill and confidential and proprietary information—which Philadelphia Insurance spent years building—and will inevitably use and draw upon such goodwill and information in their competitive activities, especially including information pertaining to actual and prospective Philadelphia Insurance agents and accounts and the business and communications conducted by Philadelphia Insurance with said agents and accounts.

110.    Philadelphia Insurance alleges, upon information and belief, that Defendants have engaged in, are preparing to engage in, and/or are continuing to engage in, *inter alia*, the following acts:

(a)     directly or indirectly soliciting and encouraging Philadelphia Insurance's employees to leave their employment with Philadelphia Insurance and/or to join Defendants in their capacities as employees and/or representatives of Amynta, Philadelphia Insurance's direct competitor;

(b)     soliciting and/or preparing to solicit Philadelphia Insurance's customers, including agents and accounts, to terminate their relationship with Philadelphia Insurance and/or to conduct business with and/or through Amynta; and

(c)     other such acts contrary to the terms, conditions, and provisions of the employment and post-employment obligations owed to Philadelphia Insurance by the Individual Defendants (*see generally* Exhibit 1 and 2 attached hereto), and Philadelphia Insurance's trade secret, property, proprietary information, and other rights.

111.    By virtue of the foregoing, Philadelphia Insurance has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of a preliminary injunction against Defendants.

DM1\12560629.1

112.     By virtue of the nearly simultaneous and coordinated departure of May's entire team, Philadelphia has suffered, and will continue to suffer office instability and disruption to its business and operations.

113.     Defendants intended to, and did, severely harm Philadelphia Insurance's commercial surety business in the five (5) regions covered by the May team to allow Amynta to unfairly compete virtually overnight.

114.     Unless Defendants are preliminarily enjoined from the foregoing conduct, Philadelphia Insurance will be irreparably harmed by further business interruption and future losses, which are presently incalculable.

115.     Philadelphia Insurance has no adequate remedy at law.

116.     The balancing of the harms and the public interest also strongly militate in favor of injunctive relief.

## COUNT I

## BREACH OF CONTRACT AGAINST
## INDIVIDUAL DEFENDANTS MAY AND SPICHER

117.     The allegations of Paragraphs 1 through 116 are incorporated herein by reference with the same force and effect as if set forth in full below.

118.     Defendants May and Spicher entered into the Confidentiality and Noncompetition Agreements on March 12, 2015 and March 23, 2015, respectively, in consideration of, and as a condition of, their employment with Philadelphia Insurance and the benefits associated therewith.

119.     The May and Spicher Agreements are valid and enforceable contracts.

120.     The May and Spicher Agreements are supported by adequate consideration.

DM1\12560629.1

121.    The covenants in the Agreements are reasonable and necessary to protect Philadelphia Insurance's legitimate business interests.

122.    Defendants May and Spicher have breached their obligations under the May and Spicher Agreements, including but not limited to, by directly or indirectly: encouraging Philadelphia Insurance's employees to leave Philadelphia Insurance and/or to join Amynta, soliciting and recruiting Philadelphia Insurance's employees to Amynta, and/or aiding Amynta in seeking to recruit and/or hire Philadelphia Insurance's employees; and/or by otherwise violating their obligations under the agreements. (*See* Exhibit 1 and 2 at ¶ 2-3).

123.    Upon information and belief, May and Spicher further intend to solicit and/or conduct business with Philadelphia Insurance's clients, agents, and accounts in ways that violate the May and Spicher Agreements.

124.    As a direct result of May's and Spicher's breaches of contract, Philadelphia Insurance has been and/or will be irreparably harmed and has suffered damages in an amount that is not presently calculable.

125.    In addition, Philadelphia Insurance has incurred, and will continue to incur, attorneys' fees and costs in connection with May's and Spicher's breaches of the Agreements, for which May and Spicher are liable.

## COUNT II

## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY AGAINST INDIVIDUAL DEFENDANTS MAY AND SPICHER

126.    The allegations of Paragraphs 1 through 116 are incorporated herein by reference with the same force and effect as if set forth in full below.

127.    As a Vice President and Underwriting Manager, respectively, within Philadelphia Insurance's Commercial Surety Division, Defendants May and Spicher owed Philadelphia Insurance a fiduciary duty and duty of loyalty.

128.    During their employment, May and Spicher owed Philadelphia Insurance the utmost duties of good faith, loyalty, and honesty and were obligated to act in good faith with due regard to the interests of Philadelphia Insurance.

129.    So long as May and Spicher remained employed, Philadelphia Insurance depended on them to act in its best interests, and not in the interests of a competitor.

130.    May and Spicher owed Philadelphia Insurance a duty to not undercut Philadelphia Insurance's interest or position, to deal with the Company honestly, and to not assist a competitor.

131.    Upon information and belief, May and Spicher breached their common law duty of loyalty and fiduciary duty arising under their employment relationship with Philadelphia Insurance by, *while employed by Philadelphia Insurance*:

(a)    sowing discontent with Philadelphia Insurance employees and fostering an unnecessary divide between Philadelphia Insurance and its "home office", on the one hand, and the company's employees (including the Departing Employees), on the other hand;

(b)    expressing negativity about Philadelphia Insurance and/or its "home office" employees to one or more agents; and/or

(c)    scheming to, directly or indirectly, recruit others to leave Philadelphia Insurance's employment and join them in their competitive employment with Amynta and to otherwise act in a manner harmful to the employer whose best interests May and Spicher were under a duty to promote.

132.    May and Spicher willfully, intentionally, and with actual malice breached their fiduciary duties and duties of loyalty to Philadelphia Insurance.

DM1\12560629.1

133.    As a consequence, Philadelphia Insurance has been and/or will be irreparably harmed and has suffered and/or will suffer damages that are presently incalculable.

134.    In addition, May and Spicher received compensation and benefits during their period of disloyalty, which they are obligated to repay to Philadelphia Insurance.

## COUNT III

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST DEFENDANT AMYNTA

135.    The allegations of Paragraphs 1 through 125 are incorporated herein by reference with the same force and effect as if set forth in full below.

136.    The May and Spicher Agreements are valid and enforceable contracts.

137.    The May and Spicher Agreements are supported by adequate consideration.

138.    The covenants in the May and Spicher Agreements are reasonable and necessary to protect Philadelphia Insurance's legitimate business interests.

139.    Defendants May and Spicher have breached their obligations under the May and Spicher Agreements, including but not limited to, by directly or indirectly: encouraging Philadelphia Insurance's employees to leave Philadelphia Insurance and/or to join Amynta, soliciting and recruiting Philadelphia Insurance's employees to Amynta, and/or aiding Amynta in seeking to recruit and/or hire Philadelphia Insurance's employees; and/or by otherwise violating their obligations under the agreements. (*See* Exhibit 1 and 2 at ¶ 2-3).

140.    Upon information and belief, May and Spicher further intend to solicit and/or conduct business with Philadelphia Insurance's clients, agents, and accounts in ways that violate the May and Spicher Agreements, on behalf of Amynta.

DM1\12560629.1

141.    Upon information and belief, Amynta knew of the May and Spicher Agreements and of the restrictions contained therein.

142.    Despite knowledge of the May and Spicher Agreements, upon information and belief, Amynta assisted, encouraged, and facilitated May and Spicher to breach their agreements by supporting, encouraging, and/or assisting the unlawful direct or indirect solicitation and recruitment of Philadelphia Insurance's employees to leave Philadelphia Insurance and join Amynta and by knowingly and intentionally soliciting May and Spicher to work for Amynta in positions and allow them to participate in activities that require them and/or will inevitably lead them to violate their agreements, for the benefit of Amynta and/or with the intent to injure Philadelphia Insurance.

143.    Amynta's actions have been and are being taken deliberately and without privilege or justification, and have resulted or have the potential to result in the loss of a large number of Philadelphia Insurance's key employees, clients, agents, and/or accounts and repeated violations of the May and Spicher Agreements with Philadelphia Insurance.

144.    As a consequence of the foregoing, Philadelphia Insurance has been and/or will be irreparably harmed and has suffered and/or will suffer damages in an amount that is presently incalculable.

## COUNT IV

## AIDING AND ABETTING DEFENDANT MAY'S AND DEFENDANT SPICHER'S BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY AGAINST DEFENDANT AMYNTA

145.    The allegations of Paragraphs 1 through 116 and 126 through 134 are incorporated herein by reference with the same force and effect as if set forth in full below.

146.     As a Vice President and Underwriting Manager within Philadelphia Insurance's Commercial Surety Division, Defendants May and Spicher, respectively, owed Philadelphia Insurance a fiduciary duty and duty of loyalty.

147.     During their employment, May and Spicher owed Philadelphia Insurance the utmost duties of good faith, loyalty, and honesty and were obligated to act in good faith with due regard to the interests of Philadelphia Insurance.

148.     So long as May and Spicher remained employed, Philadelphia Insurance depended on them to act in its best interests, and not in the interests of a competitor.

149.     May and Spicher owed Philadelphia Insurance a duty to not undercut Philadelphia Insurance's interest or position, to deal with the Company honestly, and to not assist a competitor.

150.     Upon information and belief, May and Spicher breached their common law duty of loyalty and fiduciary duty arising under their employment relationship with Philadelphia Insurance by, *while employed by Philadelphia Insurance*:

(a)      sowing discontent with Philadelphia Insurance employees and fostering an unnecessary divide between Philadelphia Insurance and its "home office", on the one hand, and the company's employees (including the Departing Employees), on the other hand;

(b)      expressing negativity about Philadelphia Insurance and/or its "home office" employees to one or more agents; and/or

(c)      scheming, directly and/or indirectly, to recruit others to leave Philadelphia Insurance's employment and join them in their competitive employment with Amynta and to otherwise act in a manner harmful to the employer whose best interests May and Spicher were under a duty to promote.

151.     Amynta was aware of May's and Spicher's duty of loyalty and fiduciary duty to Philadelphia Insurance.

152.    Upon information and belief, despite knowing of May's and Spicher's duty of loyalty and fiduciary duty, Amynta aided and assisted May and Spicher in breaching these duties by assisting them to directly and/or indirectly recruit the Departing Employees to leave Philadelphia Insurance and/or begin employment with Amynta and/or directly and/or indirectly assist Amynta to recruit and/or hire the Departing Employees.

153.    As a consequence, Philadelphia Insurance has been and/or will be irreparably harmed and has suffered and/or will suffer damages that are presently incalculable.

## COUNT V

## UNFAIR COMPETITION AGAINST DEFENDANT AMYNTA

154.    The allegations of Paragraphs 1 through 153 incorporated herein by reference with the same force and effect as if set forth in full below.

155.    Upon information and belief, Amynta has willfully and intentionally recruited an entire team of Philadelphia Insurance's employees in the Commercial Surety Division to work for Amynta for an improper purpose and to support its calculated efforts to expand into the surety field virtually overnight by crippling Philadelphia Insurance's commercial surety business.

156.    Amynta intended the foregoing unlawful and intentional acts to cause damage to Philadelphia Insurance in its lawful business, with a conscious desire to disrupt Philadelphia Insurance's business operations and office stability to prevent Philadelphia Insurance from servicing and maintaining client and agent relationships, and have resulted in actual and anticipated damage or loss to Philadelphia Insurance, which Amynta knew or was substantially certain would occur.

157.    This conduct by Amynta constitutes unfair competition with Philadelphia Insurance, all of which has caused and will continue to cause irreparable injury to Philadelphia Insurance's goodwill and presence in the surety marketplace unless enjoined by this Court.

158.    As a consequence of the foregoing, Philadelphia Insurance has been and/or will be irreparably harmed and has suffered and/or will suffer damages in an amount that is presently incalculable.

## COUNT VI

### DECLARATORY JUDGMENT AGAINST
### DEFENDANT MAY AND DEFENDANT SPICHER

159.    The allegations of Paragraphs 1 through XX are incorporated herein by reference with the same force and effect as if set forth in full below.

160.    "[A]ny court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration.  28 U.S.C.A. § 2201; *also see* 42 Pa.C.S.A. § 7532.

161.    A justiciable and actual controversy exists between the parties, who are clearly adverse to each other, because a declaratory judgment will terminate the controversy surrounding whether Defendants May and Spicher were terminated for "Cause" under their respective Confidentiality and Noncompetition Agreements and are prohibited, in relevant part and without limitation, from soliciting any current or prospective agent, broker, insured, policyholder, customer, account, or any lead derived from Philadelphia Insurance who they serviced or whose name became known to them during the two (2) years preceding termination of Employee's employment for a period of twelve (12) months.  Eventual litigation on this issue is unavoidable.

162.     Furthermore, the relief sought in this Count will clarify and settle the legal relations at issue in this case and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this action.

163.     The justiciable and actual controversy between the parties is ripe for resolution by this Court.

164.     This declaratory judgment action, brought under the Pennsylvania Declaratory Judgments Act, 42 Pa.C.S.A. § 7531 *et seq*., is appropriate and will serve to terminate the controversy between the parties concerning their actions relating to the Confidentiality and Noncompetition Agreements.

165.     Therefore, Philadelphia Insurance respectfully requests that the Court enter a declaratory judgment that, for a period of twelve (12) months following their termination of employment with Philadelphia Insurance (unless extended for the period of any violation):

(a)     May and Spicher are prohibited from soliciting, by mail, email, phone, personal meeting, or other means, any current or prospective agent, broker, insured, policyholder, customer, account, or any lead derived therefrom whom May and Spicher, respectively, serviced or whose name became known to him either directly or indirectly during the two (2) years preceding termination of his employment with Philadelphia Insurance (hereinafter "Company Business Contact"), for purposes of inviting or encouraging such Company Business Contact to transfer its business, business relationship, or patronage from Philadelphia Insurance to him, to his new employer, or to any other third party;

(b)     May and Spicher are prohibited from pursuing, soliciting, or procuring bonds for any surety account with which May or Spicher, respectively, did not have a relationship prior to May or Spicher's respective term of employment with Philadelphia Insurance and for which Philadelphia Insurance issues bonds, instruments of guarantee or other surety obligations during their term with Philadelphia Insurance; and

(c)     because May and Spicher were terminated for cause, pursuant to Section 2 of their Agreements, the exceptions to the restrictions set forth in Section 2 of their Agreements do not apply.

166.    Philadelphia Insurance further respectfully requests that the Court enter a declaratory judgment that Defendant May and Defendant Spicher violated the terms of their respective Confidentiality and Noncompetition Agreements.

E.    **CONDITIONS PRECEDENT**

167.    All conditions precedent to the recovery of the relief requested by Philadelphia Insurance herein have occurred.

34

## PRAYER FOR RELIEF

WHEREFORE, Philadelphia Insurance demands judgment in their favor and against Defendants, and respectfully request the following relief:

A.      Preliminary and permanent injunctive relief to prevent May and Spicher from violating their respective Agreements with Philadelphia Insurance and to prevent Amynta from interfering with those Agreements;

B.      Any actual, compensatory, and consequential damages, to the extent such damages are capable of being calculated, that Philadelphia Insurance is entitled to recover as a result of Defendants' actions;

C.      Disgorgement of compensation and benefits paid to May and Spicher during their period of disloyalty;

D.      Disgorgement of the amounts by which Defendants were unjustly enriched by their improper conduct;

E.      Exemplary damages as permitted by law;

F.      A declaration that May and Spicher were terminated for "Cause" under their respective Confidentiality and Noncompetition Agreements and are bound by all of the obligations therein;

G.      A declaration that May and Spicher violated the terms of their respective Confidentiality and Noncompetition Agreements;

     a.      A declaration that, for a period of twelve (12) months following their termination of employment with Philadelphia Insurance (unless extended for the period of any violation):

         i.      May and Spicher are prohibited from:

1. soliciting, by mail, email, phone, personal meeting, or other means, any current or prospective agent, broker, insured, policyholder, customer, account, or any lead derived therefrom whom May and Spicher, respectively, serviced or whose name became known to him either directly or indirectly during the two (2) years preceding termination of his employment with Philadelphia Insurance (hereinafter "Company Business Contact"), for purposes of inviting or encouraging such Company Business Contact to transfer its business, business relationship, or patronage from Philadelphia Insurance to him, to his new employer, or to any other third party; or

2. pursuing, soliciting, or procuring bonds for any surety account with which May or Spicher, respectively, did not have a relationship prior to May or Spicher's respective term of employment with Philadelphia Insurance and for which Philadelphia Insurance issues bonds, instruments of guarantee or other surety obligations during their term with Philadelphia Insurance; and

ii. because May and Spicher were terminated for cause, pursuant to Section 2 of their Agreements, the exceptions to the restrictions set forth in Section 2 of their Agreements do not apply.

H. Reasonable attorneys' fees and costs pursuant to May's and Spicher's respective Confidentiality and Noncompetition Agreements; and

I. All such other relief as this Court deems appropriate.

Respectfully submitted,

**DUANE MORRIS** LLP

*/s/ Shannon Hampton Sutherland*
Shannon Hampton Sutherland (Pa. 90108)
E-mail:shsutherland@duanemorris.com
Elisabeth Bassani (Pa. 327199)
E-mail: ebassani@duanemorris.com
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: +1 215 979 1000
Fax: +1 215 979 1020

36

Dated: October 25, 2021                    *Attorneys for Plaintiff, Maguire Insurance Agency, Inc. d/b/a Philadelphia Insurance*

## VERIFICATION OF MICHAEL CUNDIFF

I, Michael Cundiff, Senior Vice President of Surety of Plaintiff, Maguire Insurance Agency, Inc. d/b/a Philadelphia Insurance Companies, make this verification on behalf of Plaintiff. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the allegations in the foregoing Verified Complaint are true and correct.

Executed on October 25, 2021.

_____
Michael Cundiff